STATE, Respondent, vs. SCHMACK, Appellant.

*May 8—June 2, 1953.*

For the appellant there was a brief and oral argument by *Allan Cain* of Kaukauna.

For the respondent there was a brief by the *Attorney General,* and *William A. Platz,* assistant attorney general, and *Bernard Bertrand,* district attorney of Brown county, and oral argument by *Mr. Platz* and *Mr. Bertrand.*

MARTIN, J.    Defendant contends that the evidence is insufficient to warrant conviction of operating an automobile while under the influence of intoxicating liquor. In our opinion the evidence was sufficient to present a jury issue.

As stated above, the officers testified that they detected the odor of alcohol on defendant's breath. One of the officers stated that defendant told him at the hospital that he had had a bottle of warm beer before he left home on the day of the accident. It is admitted that he had a drink of whiskey or brandy around 9:30 a. m. Defendant denied that he had anything more to drink that day, but considering all the testimony as to the events that occurred, the jury had the right to disbelieve him. To require evidence showing that

defendant actually consumed sufficient alcohol to establish that he was intoxicated would be to place an impossible burden upon the state. Although a blood test was taken upon defendant's arrival at the hospital on the evening of August 20th, the results of the alcohol blood analysis were not offered in evidence because defendant was not arrested until September 12, 1951. See *State v. Resler* (1952), 262 Wis. 285, 55 N. W. (2d) 35.

Defendant attempted to show that his "fainting spells," his erratic driving, and unawareness of events were due to a physical illness, pernicious anemia. It was shown that about two months before the accident he had consulted Dr. C. E. Zellmer with regard to dizzy spells and feeling weak and tired. The doctor testified that he thought defendant was anemic and run-down, but he did not actually treat him for what he called a "moderate" case of pernicious anemia until after the accident. He did not have a blood count taken until August 26, 1951, after defendant's discharge from the hospital. Another was taken at his request on November 13, 1952. According to Dr. Zellmer's testimony, the first test showed a red count of a little below 4,000,000 and a white count of 9,000, which was low, and the hemoglobin was abnormally high, which is characteristic of pernicious anemia; that a red count of 5,000,000 is normal and 4,000,000 was not normal. Dr. Zellmer did not have his records with him on the trial.

Dr. Rose, referring to the hospital record of the blood count taken August 20, 1951, testified that the red count there shown, 4,750,000, the white count of 13,000, and the hemoglobin of 15 grams per 100 cubic centimeters were all within normal limits, and it was his opinion, upon the basis of his observation of the defendant and the results of the laboratory analysis, that the defendant did not have pernicious anemia. He testified that if any abnormalities appear on the routine blood count, additional procedures

are used in the diagnosis of pernicious anemia, such as the analysis of the bone marrow; and, further, that proper treatment of a patient with pernicious anemia would include frequent blood counts to determine the progress of the illness and the response to treatment.

The conflict in the evidence presented by the testimony of Dr. Zellmer and Dr. Rose was for the jury to resolve. We agree with the trial court that it was entitled to believe Dr. Rose and reject the defendant's explanation of his conduct as due to pernicious anemia.

Having accepted Dr. Rose's testimony that defendant's blood condition was not responsible for his conduct, the jury could properly infer from all the evidence that defendant was indeed intoxicated at the time of the accident. He had two drinks by the middle of the morning; he was in and out of a tavern a number of times thereafter; he fell to the floor on two occasions in Routzahn's tavern; he drove his automobile in a zigzag, weaving manner prior to the accident; the odor of alcohol was detected on his breath by the traffic officers. It is also to be noted that he was not aware that an accident had occurred, and that he could not explain where he was going at the time it happened. He told Officer Keehan the day after the accident that he was going to Suring to buy eggs, but Suring is northeast of Shawano whereas the accident occurred southeast of Shawano. On the trial he testified that he was on his way to Pulaski to buy an oilstove, but the scene of the accident is not on the route between Shawano and Pulaski.

Defendant also contends that the trial court erred in admitting the testimony of Arlie Utech mentioned above, and that of one Raymond Mosher who stated that in driving toward Shawano from Bonduel between 5 and 5:15 p. m. on August 20, 1951, he met a two-toned green Pontiac which was weaving from side to side, and only avoided colliding with it by swinging onto the shoulder of the road. Upon

being shown photographs of the defendant's car, the witness identified it as the one he met, but admitted upon cross-examination that since the photographs were not in color he could not positively identify it.

In our opinion, it was for the defendant's counsel, upon cross-examination, to point out such flaws in this testimony as would satisfy the trial court as to its irrelevancy, since such questions are primarily within the discretion of the trial court; but in the decision of the lower court it is stated: "While he . . . naturally could not be certain that the two-toned Pontiac appearing in the photographs was the identical car he passed, his identification of the car as being defendant's car was strong and convincing." The time and place and manner of operation of the automobile described by these witnesses gave rise to a strong probability that the car observed by them was that of the defendant, and we can see no abuse of discretion on the part of the trial court in admitting such evidence in rebuttal to defendant's claim that he drove in a proper manner between Shawano and Bonduel.

Defendant makes the further claim that the trial court erred in permitting Dr. Rose to sit with the district attorney and advise him during the cross-examination of Dr. Zellmer, but he does not state the basis for such contention and we see no merit in it.

*By the Court.*—Judgment affirmed.